STEWART v. RAILROAD.

(Filed May 1, 1906).

*Railroads — Rules — Experts — Evidence—Time Tables— Train Sheets—Collisions—Presumption of Negligence— Contributory Negligence—"Block System"—Telegraph Stations—Train Crew—Questions for Jury—Appliances —Proximate Cause—Burden of Proof.*

1.   In an action for death of an engineer, the court properly excluded expert testimony as to the construction, application and effect of the rules prescribed by the defendant for the government of engineers in the operation of trains, as there was nothing in the rules requiring or justifying resort to expert evidence in regard to the meaning of the language.

2.   There was no error in excluding a question asked an expert as to whether plaintiff's intestate's engine was running solely by telegraphic orders, as it was the duty of the court to declare the law in regard to plaintiff's intestate's duties upon a construction of the rules and orders.

STEWART *v.* RAILROAD.

3.  In an action for death of an engineer in a collision, defendant's time table and train sheets of the day on which the collision occurred were competent to show the movement of trains on that day.

4.  Where testimony objected to was competent to show the movement of trains on the day of the collision, if defendant desired to have the jury restricted in their consideration of it to that particular phase of the case, a request to that effect should have been made.

5.  The testimony of a witness, found by the court to be an expert in the management, running and equipment of trains, as to what constituted a train crew generally, and as to what was a proper train crew for light engines, and that an engine should not be sent out without a conductor, was competent.

6.  There is a presumption of negligence arising out of proof of a collision in the daytime.

7.  While railroad companies may make reasonable rules for the government of their employees and it is the duty of the employees to obey such rules, and their failure to do so is evidence of contributory negligence, yet the ultimate standard of duty is fixed by the law and not the rules, and the rules do not absolve the company from all duty to care for the safety of their employees.

8.  When the defendant's train dispatcher sent plaintiff's intestate out on an extra with no conductor, to move over a road on which he must meet four trains, all but one of which were running "off time," and that one so running until it reached a certain station, it was its duty, measured by the standard of a prudent man, to keep a lookout for his safety and keep him advised of the movement of approaching trains.

9.  In an action for death of an engineer in a collision, there was no error in modifying defendant's special instruction, "That if the jury shall find from the evidence that the system of moving trains on the defendant's road at the time of this injury was reasonably safe and one in general use on railroads in the United States, then the defendant has not been guilty of negligence in this respect, and the jury will answer the first issue 'no' " by adding, "Unless the jury shall further find that the block system was a safer system and was in general use upon railroads of the United States of like character in respect of construction and the amount of traffic as the defendant."

10.  It is the duty of a railroad company to establish only such telegraph stations along its line as are necessary for the proper running of its trains, with regard for the safety of its employees and passengers.

11.  In an action for death of an engineer in a collision, there was no error in modifying defendant's special instruction, "If the jury found that the rules of the defendant company permitted the running of an engine and tender with a crew of only an engineer and fireman, and such were the standard rules of the American Association of Railways, the defendant was not guilty of negligence in that respect," by adding "And that the running of an engine with such crew on such a trip as this one, was reasonably safe," etc.

12.  Where, in an action for death of an engineer in a collision, witnesses testified that the block system tended to give one train exclusive use of the track between certain points, that it induced to safety and economy, and was an additional safeguard, etc., and there was evidence as to the extent of the use of the system, the court correctly refused to charge the jury "That upon all of the evidence it was not negligence to fail to use the block system" and properly submitted the question to the jury.

13.  There was no error in modifying defendant's special instruction, "If the jury found the system of signals and rules for the operation of its trains in use by defendant were the same in general use at the time of the collision, then defendant was not guilty of negligence in failing to adopt another system," etc., by adding, "Unless they shall find that such system is safer or 'most approved and in general use' in the United States by railroads of like condition as the defendant."

14.  An instruction that "If plaintiff's intestate saw the witness, or by the exercise of ordinary care could have seen him wave his hat, it was his duty to have stopped his engine, and if such violation was the proximate cause of the injury the jury would answer the second issue 'yes,'" is correct.

15.  In an action for death of an engineer in a collision, the burden as to the issue of contributory negligence was on the defendant to remove the presumption that deceased exercised due care for his own safety.

ACTION by Mary A. Stewart, Administratrix of S. T. Stewart, against the Raleigh & Augusta and Seaboard Air

Line Railway Co., heard by *Judge Chas. M. Cooke* and a jury, at the October Term, 1905, of the Superior Court of WAKE.

Action by plaintiff to recover damages for the death of her intestate by reason of alleged negligence of defendant. There was evidence tending to show that plaintiff's intestate was, on June 23, 1903, in the employment of defendant as locomotive engineer; had run train No. 6 on the main line; he was given a copy of defendant's book of rules and stood an examination as required by the company, which was put in evidence. At 5:57 o'clock a. m. of June 23, 1903, he received a telegraphic order from the proper authority in the following words: "To conductor and engineman of engine 200: Engine 200 will run extra Johnston street to Aberdeen, speed 20 miles per hour. A. W. T."

He left Johnston Street station at 6:10 a. m. on engine No. 200, tender attached, with fireman, traveling southward. Defendant on that day was operating over its road between Raleigh and Hamlet, including Aberdeen, moving northward, the following trains, to-wit: No. 66, a first-class train, schedule time leaving Hamlet 8:55 a. m. and Southern Pines 9:45, *there to pass No. 6, a third-class local freight;* Manly 9:48, Vass 9:58. No. 38, first-class mail leaving Hamlet 7:50, Southern Pines 8:45, Vass 9:04, Cameron 9:14. No. 8, a second-class vegetable express, leaving Hamlet 7:00, Aberdeen 8:15, *there to pass No. 6, Southern Pines* 8:25, Vass 8:45. No. 6, a third-class local freight leaving Hamlet 6:10, arriving Aberdeen 8:15, leaving Aberdeen 9:10; *and is passed there by No. 8 and 38,* Southern Pines 9:45, *and is passed there by No. 66;* Manly 10:05, Vass 10:25. The foregoing is the schedule put in evidence for the several trains moving northward between Raleigh and Hamlet, between 6:10 and 12 m. All of these trains were regular, run by time table and known by number. No. 200 was an extra, run by telegraphic orders (record, pp. 17,

18). At Sanford the engineer on No. 200 received at 8:33 a. m. the following order: "To engineman and conductor, extra 200 south: No. 8, engine 659, will wait at Vass until 10 a. m. for extra 200 south;" also "No. 66, engine, unknown, will run 40 minutes late Hamlet to Sanford, and 30 minutes late Sanford to Johnston street." No other orders were given No. 200. Time table June 23, 1903, was introduced by defendant and showed the movement of trains. "Extra 200 left Johnston street station 6:10 a. m., arrived at Sanford 8:33, Cameron 9:10, left 9:21, arrived at Vass 9:38, left 10:02." No. 6 left Hamlet 7 a. m., arrived at Aberdeen 8:18, left 9:33, arrived Southern Pines 9:47, left at 10.

No. 8 left Southern Pines 9:42, arrived at Vass 9:59 and passed extra 200. The conductor of No. 6 received at Aberdeen the order in regard to moving of No. 66—same as received by No. 200. No meeting place was made for No. 6 and No. 200 extra.

F. W. Taylor, defendant's operator at Vass, testified that Stewart, the plaintiff's intestate, came into his office and asked if he could not get more time on No. 8; that he wired dispatcher asking for more time on No. 8 for 200 extra; he answered that No. 8 would be there in a few minutes and that it passed Vass at 9:59. As Stewart was going out of the door of his office, the witness asked him how much time he had on No. 66, and he replied that he had 40 minutes on 66, and was going to try to make Southern Pines. The witness did not remember that anything was said about No. 6. He left at 10:02. The witness reported to train dispatcher who wired him to go out and see if Stewart was gone, and he had gone. The witness reported to dispatcher who told him to try to get Niagara or Manly over the telephone, which he did, but failed. There was a private telephone at both places. The witness was unaware of the movement of trains except what Stewart told him. He put out

white board of semaphore when Stewart left Vass, which signifies safety and is a signal to go on.

C. W. Jones, the defendant's operator at Southern Pines, testified that No. 6 left there at 10 a. m. and that he reported at 10:02 to train dispatcher at Raleigh, who immediately asked him to stop it; he tried by use of telephone, but could not do so; he had no orders for No. 6.

No. 8 ran one hour late from Hamlet to Cameron. This was communicated to No. 6. Stewart was given a clearance card at Sanford.

Page, the conductor on No. 6, testified that he arrived at Southern Pines at 9:47 and left at 10 o'clock, passed Manly at 10:06, and at 10:12 collided on the curve with No. 200 extra, when Stewart was killed. The witness had orders that No. 66 would run 40 minutes late; had no orders in regard to extra No. 200. Manly is 6.7 miles south of Vass; Southern Pines 1.5 miles south of Manly, making 8.02. There is no telegraph office at Manly—a siding there. Niagara is a siding, being near Southern Pines, having no telegraph office. No. 200 had no conductor or flagman. It was going to Aberdeen to be used as a shifting engine. By the rules "extras are distinguished as passenger extras, freight extras, and working train extras." Defendant was operating over the road from Norlina to Hamlet, on June 23, 1903, fifteen trains during the 24 hours, including extra No. 200. Defendant did not maintain the block system in the operation of its trains. Telegraph offices were maintained at an average distance of six miles between Hamlet and Raleigh. The rules, 382, 383, provide that all extra trains are of inferior class to all regular trains of whatever class. A train of inferior class must in all cases keep out of the way of a train of superior class. Defendant introduced a large number of rules, not necessary to set forth at this point. It introduced the depositions of six witnesses, being general managers and superintendents, in regard to

the use of the block system by their own and other roads and systems of railroads in this country. The general import of this testimony tended to show that the block system was in use on roads having a very heavy traffic, and when two or more very fast passenger trains are moving within short distances of each other, but that they do not consider it necessary for the protection of trains on single track roads when the number of trains was not large. Several of the witnesses thought about 15 to 20 per cent of the mileage of railroads used the block system. They agreed in the opinion that it tended to minimize the danger to operatives of roads using a single track and which is much crowded with traffic, and that it was an additional safeguard.

Defendant introduced George Lutterloh, who testified that on the day of the collision he was at work in his field near the track. That he saw two trains coming from opposite directions; knew there was no siding near Niagara and knew they would run together. Ran to the track, No. 200 was coming round the curve; he went upon the track about 250 yards ahead of train. That engineer blew whistle as he came through the cut. Witness waved a large straw hat across the track; engineer was hanging his head out of the window, did not slack up, had plenty of time to do so after witness waved hat. Saw the fireman looking at him and saw the collision. Witness thinks the engineer saw him because he blew the whistle. Stewart was running fast. Plaintiff introduced Mr. B. R. Lacy, who qualified himself as an expert locomotive engineer and testified: "A train crew ought to consist of an engineer, a fireman, a conductor and a flagman, but it depends entirely upon how many cars, as to how many brakemen you want. I do not think an engine ought to be sent out without a conductor. A light engine ought to have an engineer and a fireman and a conductor. I think there was a great deal more risk in trusting one man with one watch than in trusting two men with two watches. I can-

not tell you the degree, but two men entrusted with an engine, both watching the schedule and both with watches that have been examined by your examiner, there is very much less danger than intrusting the train with one man to look after the engine, to look at the schedule and his watch also. I am familiar with the rules under which the Seaboard runs. Under these rules it is not possible to have a head-on collision without somebody violating some of them. If there had been a conductor on extra No. 200 he would never have let engineer leave the station. You have never heard of a head-on collision with a conductor and engineer on such a train. Know the curve on which the collision occurred. It was so that the engineer had to get almost on it before he could see the other train. According to Lutterloh's testimony the curve would appear on the fireman's side of the engine."

Plaintiff alleged that the defendant was negligent in the following particulars: "(a) In that defendant sent intestate upon the said trip without furnishing a conductor and flagman for the said engine and tender which he was driving. (b) In that defendant failed to arrange a meeting place for extra 200, the train which plaintiff's intestate was operating, and train No. 6, which was moving in an opposite direction. (c) In that defendant's operator and agent at Vass failed to promptly notify the train dispatcher at Raleigh of the arrival at and contemplated departure of extra 200 from Vass. (e) In that defendant's agent and operator at Southern Pines failed to notify the defendant's train dispatcher at Raleigh of the arrival of No. 6 at Southern Pines, and the departure of said No. 6 from said station. (f) In that defendant permitted extra 200 to leave Vass and No. 6 to leave Southern Pines without giving to the crew of either train any knowledge of the movements of the other when said trains were moving in the opposite direction and at a time when said defendant should have known that

said trains would collide.    (g) In that the crew of ·No. 6 violated rule 309 of said defendant in leaving Southern Pines in less than 20 minutes after another train, No. 8, moving in the same direction, had left said station.    (h) In that the crew of No. 6 violated rule No. 405 of said defendant in leaving Southern Pines before the arrival and departure of No. 66, a passenger train which was delayed 40 minutes and was moving in the same direction.    (i) In that defendant failed to have and maintain telegraph offices and operators for the government of their trians and in the management and protection thereof at Manly, Niagara and Lake View stations on the said road.    (j) In that defendant did not deliver unto the said Stewart and the persons having charge of the said northbound train, which collided with said Stewart's engine, full, perfect and proper orders to govern the running of said engine and northbound train No. 6. (1) In that while that portion of defendant's line of railroad upon which said collision occurred, was much used and was congested with the traffic of very many trains, defendant neglected and failed to adopt and use in operation of said train, said Stewart was operating, and the train with which he collided and of its other trains, that system of signals, telegraphic, electric and mechanical devices, services or operatives, rules and regulations, commonly known as the 'block system,' which was at said time in general use, and was a necessary and proper safeguard and protection of the safety of the operatives of the defendant's trains."

Defendant denied that it was negligent in either respect and alleged that plaintiff's intestate was guilty of contributory negligence in that he violated the orders of the company, failed to observe the signals that were given to him and failed to stop when signaled by Lutterloh and was guilty of contributory negligence in other respects.    The specific exceptions and assignments are set out in the opinion together with such portions of the judge's charge as are ex-

cepted· to. There was a verdict for the plaintiff upon all of the issues. Motion for new trial denied. Judgment and appeal.

*W. `C. Douglas, Busbee & Busbee* and *R. N. Simms* for the plaintiff.

*Pou & Fuller, Womack, Hayes & Pace,* and *Murray Allen* for the defendant.

CONNOR, J., after stating the case: It will be well to dispose of certain exceptions pointed to His Honor's ruling upon objections to the admissibility of testimony before proceeding to discuss the instructions given to the jury and the refusal to give several of those asked. These exceptions are grouped in defendant's brief because, as said, they present practically the same questions of law.

A number of rules prescribed by the company for the government of engineers in the operation of trains were introduced by defendant. It was shown that they were contained in a book, a copy of which was delivered to and in the possession of plaintiff's intestate. After qualifying Mr. Lane, chief train dispatcher, as an expert in the knowledge of the rules of the company relating to the management of trains, he was asked to explain the effect of various rules, to designate which rules were applicable to an existing state of facts and to state the duty of an employee under these rules upon certain hypothetical facts. This class of testimony was, upon objection of plaintiff, excluded, for that the rules being in writing their construction, application and effect were for the court. The learned counsel for defendant concede that His Honor's ruling is based upon a correct principle, but insist that there were a number of terms and expressions used in the rules which have a peculiar and restricted meaning known to and understood only by those who operate trains. They do not cite any authorities to aid us in the

decision of the question. It is well settled that where terms of art or language peculiar to certain trades, business, etc., are used in writings, parol evidence may be introduced to show how, among persons engaged in such trade, etc., such terms are understood, to aid the court in interpreting the instrument. 1 Greenleaf, 280. When this is done and technical terms, abbreviations, etc., are explained, it becomes the duty of the court to interpret the instrument in the light of such testimony. In doing so, it may not call to its aid expert testimony. 1 Greenleaf, 277. We find nothing in the rules requiring or justifying resort to expert evidence in regard to the meaning of the language used. While there are a large number of rules and, to one not familiar with the operation of trains, not so clear as might be desired, we see no reason why they may not be interpreted by giving to the language used its ordinary meaning and significance. The question was so decided in *Penna. R. R. v. Stoelke,* 104 Ill., 201, in which it was said: "The law and not the rules of the company define negligence. In the next place it was asking the witness to construe the rule which was not within the domain of verbal evidence." Treating the rules as a part of the contract of service made by defendant with plaintiff's intestate, it is clear that being in writing or what is the same thing, print, their construction is for the court.

Exception 7th. Defendant proposed to ask Mr. Lane whether extra No. 200 was running solely by telegraphic orders. The question was, upon objection, excluded, and defendant excepted. Mr. Lane testified that regular trains were run on schedules, and extras on telegraphic orders. The orders which plaintiff's intestate received on June 23, 1903, were put in evidence by defendant; and its witness, through whom the orders came, testified that no other orders were given him. He met and passed No. 38 at Cameron without orders. Defendant contended that Stewart was bound, in the movement of his train, by the rules which were

put in evidence and that the special order did not in any way modify or abrogate such rules. We were· of the opinion on the former appeal (137 N. C., 687,) that as a conclusion of law, in the light of the rules, No. 200 was running solely by telegraphic orders. It was competent and defendant was permitted to introduce all orders and rules of which Stewart had notice. It became the duty of the court to declare the law in regard to Stewart's duties and rights upon a construction of such rules and orders. Mr. Lane could not aid the court in that respect. He could not give his opinion, but only state facts, which he was permitted to do. There was no contradictory testimony in regard to the orders and rules. We concur with defendant's counsel that the special orders to Stewart did not abrogate the rules. The question is, what was his duty in the light of the order and the rules? We shall discuss this question when we reach the exceptions to His Honor's instructions to the jury. The exception cannot be sustained. We have examined exceptions No. 17, 18 and 19 and do not find any harmful error, if error at all. There was no suggestion that the rules were unreasonable, and His Honor, in his charge, treated them as binding upon plaintiff's intestate, constituting the measure and standard of his duty in operating his train.

In regard to exceptions 26 and 27 it is sufficient to say that the time table and train sheets of June 23 were put in evidence, showing when No. 6 and No. 8 left Aberdeen. The testimony objected to was competent to show the movement of trains on the day of the collision. If defendant desired to have the jury restricted in their consideration of it to some particular phase of the case, a request to that effect should have been made. The same is true in regard to exception 30. Exceptions 28 and 29 are abandoned in the brief. Exceptions 31 to 34 inclusive, refer to the admission of testimony of Lacy, who was found by the court to be an expert as to the management, running and equipment of

trains.  He was asked as to what constituted a train crew generally, also as to what was a proper train crew for light engines, and testified that an engine should not be sent out without a conductor.  To the questions and answers the defendant excepted, insisting that the testimony was not within the rule admitting opinion evidence.  "An experienced railroad man, who has made a business of the running and management of railroads, is as fairly an expert as one skilled in any other art, and he may give testimony as an expert in questions of railroad management.  The running and management of railways is so far an art, out of the experience and knowledge of ordinary persons, as to render the opinion of ordinary persons skilled therein admissible in evidence." Rogers Ex. Test., section 104, where cases are cited illustrating the extent to which this class of testimony has been received.  Lawson Ex. Ev., rule 22, and illustrations.  In *Ogden v. Parsons,* 23 How., 167, it is said: "What was a full cargo for the ship to carry with safety was not a fact which could be settled by any rule of law or mathematical computation, and the court must necessarily rely upon the opinions of those who have experience, skill and judgment in such matters."

In *McReary v. Turk,* 29 Ala., 244, *Rice, C. J.,* said: "Upon such a question as the sufficiency of the number of the officers and hands on a steamboat at a particular time to run her on a particular river, the judgment of ordinary persons having an opportunity of personal observation and of forming a correct opinion and testifying to the facts derived from that observation, is admissible.  The effect of admitting such opinion, as evidence, is not to submit to the decision of the witness a point which the jury alone can try, but merely to assist them in judging of a question of common sense as well as science, with which the witness may reasonably be supposed, on account of his superior opportunities for becoming acquainted with it and forinmg a correct judgment, to

have been more competent to judge than they themselves." The opinion of a machinist that machinery was unsafe was admitted in *C. & A. R. R. Co. v. Shannon,* 43 Ill., 338. The decisions, in which the general principle is applied, are not uniform. We are of the opinion that the weight of authority and the reason of the thing sustain His Honor's ruling. 12 Am. & Eng. Enc. (2 Ed.), 436. The order upon which plaintiff's intestate operated the engine was directed to "Conductor and engineman"—as was also the order in regard to meeting No. 8 at Vass.

Defendant's counsel requested His Honor to instruct the jury that if they found all of the evidence to be true, to answer the first issue "no," and to the refusal to do so excepted. This exception presents defendant's contention in regard to the several allegations of negligence. If there was evidence fit to be considered by the jury tending to sustain any one of the allegations, it is conceded that His Honor could not have properly given the instruction. The controversy in this aspect of the case is narrowed to the duty which defendant owed to Stewart, in the light of the conditions shown to have existed on June 23, 1903. There was a presumption of negligence arising out of the proof of a collision in the daytime. *Wright v. Railroad,* 127 N. C., 229; *Stewart v. Railroad,* 137 N. C., 687, in which *Clark, C. J.,* said: "If there were facts consistent with the absence of negligence on the part of the defendant, still there would be a conflict with the presumption of negligence," citing *Coffin v. U. S.,* 156 U. S., 459. His Honor could not, therefore, have instructed the jury as requested unless the uncontradicted evidence was sufficient as matter of law to rebut the presumption. The train dispatcher knew when Stewart reached Vass that No. 66 was running forty minutes late, that the schedule required that No. 66, a first-class train, should pass No. 6, a third-class train, at Southern Pines. The dispatcher further knew that Stewart, when he reached Vass, wanted "more time

on No. 8," which he had orders to pass there. It will be noted
that Stewart's order stated that No. 8 would wait until 10
o'clock for his train. When he arrived there at 9:38, No. 8
was not there. The dispatcher knew that No. 6 was at
Southern Pines at 9:47. He wired operator at Vass that
No. 8 would soon be there. It was due at Vass on schedule at
8:45, and was therefore running more than an hour late.
In this condition of the trains we look for some rule by which
No. 6 should have been governed. Was it to wait at South-
ern Pines until No. 66 had passed, or to go on its schedule?
The defendant says that it should have proceeded on its
schedule. The only rule which seems to throw light upon
the question is 405, which is as follows: "A train starting
from its initial station on each division, or leaving a junc-
tion, when a train of the same class running in the same
direction is overdue, will proceed on its own time and rights
and the over-due train will run as provided in rule 388 or
389." Rule 388 directs that passenger trains following each
other must keep not less than 10 minutes apart. Rule 389
directs that freight trains must keep 10 minutes apart.
Whether rule 405 applies in other respects, it certainly does as
controlling No. 6 in the conditions existing when it reached
Southern Pines. It was a third-class freight, while No. 66
was a first-class train. Mr. Lane, one of defendant's wit-
nesses, says that it was the duty of No. 6 to proceed on its
schedule from Southern Pines, and His Honor so charged the
jury in special instruction No. 21. But plaintiff says that de-
fendant was guilty of negligence for that, when Stewart
asked the train dispatcher at Vass for more time on No. 8,
it put him on notice that he intended to proceed from Vass
immediately upon the arrival of No. 8, and knowing that
No. 6 would proceed on its own time, and if Stewart left
Vass at the same time a collision would occur, he should have
notified Stewart to remain at Vass. While it is true that
railroad companies may make reasonable rules for the gov-

ernment of their employees and that it is the duty of the employees to obey such rules, and their failure to do so is evidence of contributory negligence, it is equally true that the ultimate standard of duty is fixed by the law and not the rules; that the rules do not absolve the company from all duty to care for the safety of their employees. Independent of the statute of 1897, abolishing all assumption of risk by employees of railroads, no assumption of risk against defendant's negligence would be recognized. When the defendant's train dispatcher sent Stewart out on an extra with no conductor, to move over a road on which he must meet four trains, all but one of which were running "off time," and that one so running until it reached Southern Pines, it was its duty, measured by the standard of a prudent man, to keep a lookout for his safety, keep him advised of the movement of approaching trains. The measure of this duty was increased when the dispatcher learned that having obeyed instructions to Vass, in the absence of any further orders, he intended moving from there immediately after No. 8 passed, and that, we think, was the reasonable construction of his request for "more time on No. 8." It was certainly a question for the jury to decide whether with this information before him, the dispatcher should not have immediately notified Stewart that No. 6 was on time and leaving Southern Pines. While he may, in the absence of any suggestion to the contrary, have reasonably relied upon Stewart's knowledge of the rules and schedules, yet when notified that for some reason Stewart was going forward it seems to us that it is a reasonable requirement that he should have warned him of his danger. His failure to do so was at least evidence of negligence, and proper to be considered by the jury. His Honor, at the request of the defendant, in the light of Lane's testimony, instructed the jury that the order in regard to No. 66 "enabled No. 6 to proceed from Southern Pines ahead of No. 66." This was Lane's construction of the rules, and in the absence

of any other evidence, accepted by His Honor. The plain-
tiff excepted to the evidence. This, of course, goes for noth-
ing, as the plaintiff does not appeal. After answering the
question, Lane proceeds to give an illustration of the practi-
cal operation of the rule. He says that the order received
by Stewart that No. 66 would run 40 minutes late "makes
the schedule time of the trains named between the points
mentioned as much later as the time stated in the order, and
every other train receiving the order is required to run with
respect to this later time, the same as before required to run
with respect to this later time as can be easily added to the
schedule time, that the order 40 minutes late could be added
to the schedule time." On page 159, Rule Book, we find this
identical language used by way of illustration. We also find
in the same connection, "No. 41, engine 228, waits for train at
Moncure until 10 a. m. for No. 6, engine 549." The train
of inferior right is required to run with respect to the time
specified, the same as before required to run with respect to
the regular schedule time of the train of superior right."
This language, as well as the reason of the thing, appears ·to
us to mean that the schedule of No. 66 was fixed by the order
to arrive at Southern Pines at 10:25, being 40 minutes added
to the regular schedule 9:45. That this change in the sched-
ule of No. 66 operated to make a like change in that of No.
6, thereby causing the regular schedule of both trains to cor-
respond, and leaving Southern Pines as the passing point as
fixed in the time table. This is certainly the practical opera-
tion of the rule requiring any other train receiving the order
to run with respect to this later time. Construed otherwise,
No. 6 has no passing point with No. 66, and in the absence
of any other orders, it is to feel its way along the road with-
out any knowledge whatever in regard to No. 200 extra. It
is manifest that the construction which we have indicated
was put upon the rule by Stewart and Taylor, the operator at
Vass. There is no other explanation of their language and

conduct.    Taylor says: "Just as he was going out of the
door, I turned around and didn't even get out of my seat,
and asked him how much time he had on No. 66, and he re-
plied back to me from the door, that he had 40 minutes on
66 and he was going to try to make Southern Pines.    This
was the last word he spoke to me."    It is impossible to under-
stand this language otherwise than by putting the construc-
tion upon it that they both understood that No. 66 was the
controlling train, and that its schedule made the schedule of
No. 6 at Southern Pines.    No. 66 was a first-class train; No.
6 a third-class local freight.    To say that both these men
knew that No. 6 was leaving Southern Pines at the same time
that Stewart was leaving Vass, is to conclude that they were
insane or demented.    That they were neither is conceded.
With 40 minutes on No. 66, Stewart had 25 mintues to make
Southern Pines, a distance of 8 miles.    We think it mani-
fest that such was his understanding, and we further think
that, if he had read the example and illustration in his book
of rules (p. 159) he would have reasonably come to that con-
clusion.    It is in this case a significant fact, shown by the
defendant's evidence, that while other trains were notified of
conditions between Vass and Southern Pines, No. 6 had no
notice that No. 200 extra was out, and No. 200 had no notice
of the movement of No. 6.    It is equally manifest that the
failure to advise them was the cause of the collision.    As we
have said, this condition was permitted to continue after the
operator at Vass knew Stewart was leaving on what is
claimed to be the time of No. 6, and the dispatcher had
knowledge of conditions which put him upon notice.    The
train sheet introduced shows that he had notice of the arrival
and departure at each station of every train.    There was
other evidence, the testimony of Lacy in regard to the crew
and that of witnesses in regard to the block system, which
we will discuss in connection with the charge.

    The defendant asked His Honor to instruct the jury that

if they believed the entire evidence the plaintiff's intestate was guilty of contributory negligence. To the refusal to give this instruction, the defendant excepted. The burden of proof on this issue was upon the defendant, and it is conceded that the court could not direct an affirmative finding, unless the evidence relied upon to sustain it is uncontradicted, and so clear that but one reasonable inference could be drawn from it. There was undoubtedly evidence tending to show negligence on the part of the plaintiff's intestate, unless he was running solely on telegraphic orders, and then it would seem that he should have asked for orders at Vass before proceeding. It would seem, however, that, taking that view of the evidence, he may have reasonably relied upon the conduct of the defendant's dispatcher in regard to his request for time on No. 8. The defendant further says that he was guilty of contributory negligence in not stopping when signalled by Lutterloh. The prayer in this respect assumes that he saw Lutterloh, and in defiance of his signal drove forward to his death. We do not think His Honor could have so found as a fact; it was a question for the jury. His Honor gave at the request of the defendant the following instructions in regard to contributory negligence:

"If the jury shall find from the evidence that though. there might have been a safer way of operating the defendant's trains, but that notwithstanding this fact, if plaintiff's intestate had followed the rules of the company he would have been safe, and that his neglect in violating the rules, which if followed would have been safe to him, was a proximate cause of his death, then the intestate was guilty of contributory negligence and you will answer the second issue 'yes.'

"If the jury shall find from the evidence that the intestate was running an extra train under an order limiting his speed to 20 miles an hour, and that he ran his engine from Vass to the point of the accident at a greater speed than 20 miles an

hour, and that this was the proximate cause of his death, and that had he confined himself to the speed named in the order the meeting of the trains would have taken place on a straight track under such circumstances that the collision might have been avoided, then the intestate was guilty of contributory negligence and the jury will answer the second issue 'yes.'

"29. If the jury shall find from the evidence that the witness, Geo. Lutterloh, was in a position to see that a collision was imminent and endeavored to stop the intestate in time to avert the same, and that the intestate saw him or could have seen him by the exercise of ordinary care, and disregarded his efforts and continued to run the engine, thereby immediately and directly bringing about the collision which he might have averted had he heeded the warning, he was guilty of contributory negligence and the jury will answer the second issue 'yes.'

"31. If the jury shall find from the evidence that the intestate was running an extra train from Johnston street to Aberdeen and that he had had no orders against No. 6, and that No. 6 was a regular scheduled train and that he ran upon the time of No. 6 without such orders, then the intestate was guilty of a violation of the rules of the company.

(b) If the jury shall find from the evidence that the intestate was running an extra train and that No. 6 was a regular scheduled train, then under the rules of the company it was his duty to clear the schedule of No. 6, and if he failed to do so he was guilty of a violation of the rules of the company.

(c) If the jury shall find from the evidence that the intestate left Vass at 10 :02 and that the schedule time of No. 6 at Manly was 10 :05, and that he was running an extra train without orders against No. 6 and that No. 6 was a scheduled train, and that the intestate could not clear any of the sidings before reaching Manly five minutes before the scheduled

time of No. 6, he was guilty of a violation of rules 390 and 383, which the court will read to the jury.

(d) If the jury shall find under the instructions just given by the court that the intestate violated any of the rules of the company and that such violation was the proximate cause of his death, then he was guilty of contributory negligence and the jury will answer the second issue 'yes.' "

His Honor in his general charge instructed the jury in regard to contributory negligence to which there was no exception. We are of the opinion that he gave the defendant the benefit of all to which it was entitled upon the second issue. He gave all that was requested except the first, which would have taken the question from the consideration of the jury. He gave a large number of special instructions at the defendant's request upon the first issue. To his refusal to give others, the defendant excepted. We will examine them in their order. Exception 39. "That if the jury shall find from the evidence that the system of moving trains on the defendant's road at the time of this injury was reasonably safe and one in general use on railroads in the United States, then the defendant has not been guilty of negligence in this respect, and the jury will answer the first issue 'no.' " This he gave after adding, "unless the jury shall further find that the block system was a safer system and was in general use upon railroads of the United States of like character in respect of construction and the amount of traffic as the defendant company." The criticism made by defendant of the modification of this instruction is that there was no evidence to sustain it. We have examined with care the depositions upon this question. They abundantly show that the block system used in moving trains increases safety and relatively decreases the danger of collision. This must be so upon the reason of the thing. It is difficult to tell to what extent the depositions show that the system is in general use. A number of railroad systems are named as using it. We are unable to tell

the mileage, etc., of such roads. It is true that the witnesses generally describe the conditions in respect to number of trains run per day and the number of tracks. Certainly it would not show a general use of any system that only a few persons or corporations are using it. It is equally true that, as a matter of common observation, we know that in obedience of legislation, both State and national, and the ruling of commissions and courts and as a matter of necessity for the security of life and property, railroad companies are rapidly adopting all such methods, systems and improvements shown to reduce the number of accidents from collisions. What was regarded a safe system in this respect ten years ago would now be regarded as utterly insufficient. In respect to such questions the courts seek to secure the highest practicable safety for the public and employees. We think that there was evidence fit for the jury upon the general use of the block system, which, if enforced, prevents such disastrous collisions as the one shown by this record. Several instructions were asked in regard to the duty of defendant to maintain telegraph offices along its road. His Honor declined them and in lieu thereof instructed the jury: "It is the duty of a railroad company to establish only such telegraph stations along its line as are necessary for the proper running of its trains, with regard for the safety of its employees and passengers and if you find that the defendant's telegraph stations were sufficient for this purpose, then the defendant has been guilty of no negligence in that regard." We think that this was a correct charge and covered the instructions asked. Defendant requested His Honor to instruct the jury that if they found that the rules of the defendant company permitted the running of an engine and tender with a crew of only an engineer and fireman and such were the standard rules of the American Association of Railways, the defendant was not guilty of negligence in that respect. The instruction was given with the words "and that the running of an

engine with such crew on such a trip as this one, was reasonably safe," etc. We find no error in the charge as given. Defendant requested His Honor to charge the jury "that upon all of the evidence in this case it was not negligence to fail to use the block system." To the refusal defendant excepted. One witness testified that the system tended to give one train exclusive use of the track between certain points. Another that it induced to safety and economy—an additional safeguard, etc. The same witnesses testified as to the extent of the use of the system. In the light of the decisions of this court in *Greenlee's case,* 122 N. C., 977, and *Troxler's case,* 124 N. C., 192, often cited with approval, His Honor correctly refused to give the instruction. He properly submitted the question to the jury. *Stewart v. R. R.,* 137 N. C., 687.

Defendant requested His Honor to charge that if the jury found the system of signals and rules for the operation of its trains in use by defendant were the same in general use at the time of the collision, then defendant was not guilty of negligence in failing to adopt another system, etc. The instruction was given with the words "unless they shall find that such system is safer or most approved and in general use in the United States by railroads of like condition as the defendant." To this language defendant excepted. Defendant contends that the language used by His Honor does violence to the well settled principle that the employer must use such appliances as are in general use and not the most approved appliances. If His Honor has, inadvertently, placed upon the defendant a heavier burden in this respect than the law permits, it is reversible error. In *Bottoms v. R. R.,* 136 N. C., 472, we held that it was error to charge the jury that the employer must use "the best approved devices and appliances for arresting sparks." It will be observed that in *Bottoms' case* no reference was made to the "general use," which is an essential element in defining the test by which the duty is

imposed. The *Chief Justice,* in that case, reviews the several decisions of this court. In *Witsell v. R. R.,* 120 N. C., 557, th court made the test to use "all known and improved machinery." This was held error, this court saying that the· rule requires the use of "all such improved appliances which are in general use." The reasoning of the interesting opinion by the present *Chief Justice* shows clearly that the being in general use is the test. His Honor evidently had that test in view in giving the instruction. It was not the "most approved," but "the most approved in general use." We do not think the jury could have been misled by the instruction as given. In regard to the testimony of Lutterloh, His Honor instructed the jury that if Stewart saw the witness or by the exercise of ordinary care could have seen him wave his hat, it was his duty to have stopped his engine, and if such violation was the proximate cause of the injury they would answer the second issue "yes." This was correct. There are fifty-seven exceptions in the record. All of them are not assigned as error in the case on appeal. We have examined the record and briefs of counsel with care and while it is not practicable to set out and discuss each exception with the instruction asked, modified and given or refused, we are of the opinion that the case has been fairly submitted to the jury. It was tried by counsel of learning and experience. Every point was contested in the lower court and here. The jury have upon a full and fair charge found the facts. It may not be improper to say that while many rules were introduced and commented upon, we are impressed, as said by the *Chief Justice,* on the first appeal, with the view that No. 200 extra was running solely under telegraphic orders and that the engineer was entitled to have such orders at each station. His last recorded words to the operator at Vass show that he regarded the road clear to Southern Pines—that he had 40 minutes on No. 66. This may account for his failure to take notice of Lutterloh's warning. Certainly it is that No.

6 was the only train which seemed to have been overlooked by everyone. No orders were given to it or others in regard to it. This was the cause of the collision. The case stripped of all complications comes to this: Some one overlooked No. 6

The law raises the presumption that it was the negligence of some of defendant's agents. The jury have found in accordance with this presumption. On the second issue the burden was on defendant to remove the presumption that Stewart exercised due care for his own safety. *Cogdell v. R. R.*, 132 N. C., 852. The court gave defendant every instruction asked, save one, upon this view of the case. The jury found the issue against defendant and we think that there was evidence to sustain the verdict. We find no error in His Honor's rulings. The judgment must be

Affirmed.