S. W. GERRINGER, admr., v. NORTH CAROLINA RAILROAD.

(Filed 13 November, 1907).

**Railroads—Crossings—Warnings—Negligence—Contributory Negligence.**

When it appears that plaintiff's intestate was killed by the engine of the lessee of the defendant company while it was backing, on a dark night, over a crossing, without light, signals or any other warning, in a thickly settled community, a clear case of negligence is made out against the defendant, and, without other evidence, the question of contributory negligence does not arise.

(The rule upon the issue of damages in *Mendenhall v. Railroad*, 123 N. C., 278, approved).

CLARK, C. J., concurring.

CIVIL ACTION to recover damages for the negligent killing of plaintiff's intestate, tried before *Justice, J.,* and a jury, at April Term, 1907, of GUILFORD Superior Court.

The following issues were submitted:

1. Was the death of the plaintiff's intestate caused by the negligence of the defendant's lessee, as alleged in the complaint? Answer: "Yes."

2. Was the plaintiff's intestate guilty of contributory negligence, as alleged in the answer? Answer: "No."

3. What damage, if any, is plaintiff entitled to recover of the defendant? Answer: "Eight thousand dollars."

From the judgment rendered defendant appealed.

*R. C. Strudwick* and *Stedman & Cooke* for plaintiff.
*King & Kimball* for defendant.

BROWN, J. At the conclusion of the argument of the learned counsel for the appellant, this Court intimated an opinion that it was unnecessary to hear from the appellee. The case appeared to us to present, upon appellant's own presentation of the facts, a clear case of liability. Our subsequent examination of the record confirms fully the correctness of our intimation, and that the presiding Judge commit-

ted no error on the trial. The evidence showed that plaintiff's intestate was run over and killed by an engine of the Southern Railway Company, lessee of defendant, whilst backing over a crossing in the night time, without any light or man with a light on the front, in the direction in which the said engine was backing, and without giving any of the signals of its approach; that it rang no bell and blew no whistle; that the said Beck's Crossing is a public crossing at Greensboro suburbs and in a thickly settled community; that there was a freight train passing said crossing on a parallel track,. going east, towards Greensboro; that the engine which killed plaintiff's intestate was backing west, towards Pomona; that they passed each other near the crossing, and that the engine ran up some fifty yards after having run over and killed the plaintiff's intestate; that the engine was running along at a very slow rate of speed, and, as one of the witnesses said, went along like something slipping along on something soft; that plaintiff's intestate had been in a store at the crossing, and was talking with a number of people, who were witnesses in this case, and stated that he was going to church and went towards the crossing; that he was not seen after he had gotten out of the light of the store door until his dead body was found on the track about five minutes later; that no engine except the shifting engine had passed along that track between the time the plaintiff's intestate left the store door and the time when his dead body was found, about five minutes later, upon the track; that the engine stopped and the engineer stated that he had killed somebody, and came back with his lights to see who it was; that he was a sober, industrious boy, sixteen years and twenty-two days old, and had been working for the railroad as a telegraph operator and was getting $57.50 a month.

Accompanying young Gerringer was a companion, named Craven, who was evidently killed at the same time, and whose body was found near Gerringer's, on the first track next to Beck's store.

No exception was taken to any of the evidence offered by plaintiff, and defendant introduced none.

In the view we take of this case, it would be a waste of time to discuss *seriatim* the twenty-five exceptions appearing in the record.

The case appears to have been tried by the learned Judge who presided upon well-settled principles laid down in numerous cases. *Purnell v. Railroad,* 122 N. C., 840; *Stanley v. Railroad,* 120 N. C., 514; *Lloyd v. Railroad,* 118 N. C., 1010; *Mayes v. Railroad,* 119 N. C., 758. The evidence that the shifting engine was backing up the track towards the crossing, upon a dark night, without any light or precautionary signal, and ran over and killed the plaintiff's intestate and his companion, Craven, is full and convincing. The facts of this case disclose a degree of carelessness upon the part of the engineer in charge of the shifting engine that is almost criminal, and for the consequences of which the company could not reasonably expect to escape liability. It would seem to those who are not initiated in the methods of railway management that it would be profitable to the company, as well as a great protection to human life, to place a watchman at Beck's Crossing, where so many people and so much traffic must necessarily cross its tracks. The recovery in this case alone would pay the salaries for a number of years to come.

The exceptions to his Honor's charge upon the issue of contributory negligence cannot be sustained. While contributory negligence, like any other fact, may be proven by circumstantial evidence, there is no fact in this record from which contributory negligence can be justly and reasonably inferred. If the Court committed any error in that portion of the charge, it is harmless, for the Judge might well have instructed the jury that there was no evidence of contributory negligence.

The exceptions, so earnestly pressed upon the argument, to that portion of the charge upon the issue of damage are untenable. His Honor charged fully upon this phase of the case. The charge is full, comprehensive and complete upon the rule for assessing damages, and is sustained by *Mendenhall v. Railroad,* 123 N. C., 278; *Carter v. Railroad,* 139 N. C., 499; *Poe v. Railroad,* 141 N. C., 525; *Watson v. Railroad,* 133 N. C., 188. In the charge is copied the very lucid statement of the rule by *Judge Oliver H. Allen,* commended by this Court in the *Mendenhall case.*

No Error.

CLARK, C. J., concurring: In view of the simultaneous deaths of these two young men at this crossing near Greensboro, and the not infrequent instances of death or maiming by railroads at the crossings near that constantly growing town (many of which have been presented by cases in this Court), the railroads might well consider appropriate steps to abolish all grade crossings near that and other populous towns in this State wherever accidents at crossings have become numerous. The crossing of public roads by a railroad track on the same grade is well-nigh unknown in Europe. It has been abolished in Massachusetts and Connecticut and to a large extent in New York. The State Courts and the United States Supreme Court have concurred in numerous decisions which hold that the abolition of grade crossings may be ordered at the expense of the railroads. See numerous cases cited in *Wilson v. Railroad,* 142 N. C., at p. 349, and *Cooper v. Railroad,* 140 N. C., at p. 229.

The act of 1899, ch. 164, now Revisal, sec. 1097 (2), confers on the Corporation Commission power "to require the raising or lowering of a track at any crossing where deemed necessary." This is re-enacted and emphasized. Laws 1907, ch. 469, sec. 1 (c).

The laws and the courts are not solely for the protection of property rights, but for enforcement as well of the constitutional guarantee of the protection of life and limb.    This Court has performed this duty in the *Greenlee* and *Troxler cases,* 122 N. C., 977, and 124 N. C., 189, which held that the absence of automatic car couplers is negligence *per se*—a negligence which is now punishable by act of Congress (1893, ch. 196; 3 U. S. Compiled Statutes, 3174); also, by a similar holding as to the lack of a "block system" (*Stewart v. Railroad,* 137 N. C., 687), which was repeated and reiterated in the same case (141 N. C., 253); and such system is now required by statute also.    Laws 1907, ch. 469, sec. 1 (b). There are other decisions of this Court which might also be cited in which we have sought to protect the lives and limbs of those exposed to unnecessary danger by the application of familiar principles, or have called the attention of the Legislature to defects in the laws.    This matter · of abolishing grade crossings near populous towns is on the same footing as car couplers and block systems.    As Lord Chancellor Erskine observed when at the bar, "Morality comes in the cold abstract from the pulpit, but men smart practically under its lessons when juries and judges are the teachers."

The courts cannot be ignorant, nor should they feign to be, of matters well known to every intelligent person.    We know, from the reports of the railroads themselves, as tabulated and published by the Interstate Commerce Commission, as required by act of Congress, that last year 95,000 persons were injured and 10,000 were killed—a total of 105,000 people killed and wounded by the railroads of the United States, as against a total of 1,685 killed and wounded in our army in the war with Spain.    In the last ten years the injured and killed by railroads in this country would make a procession of nearly 1,000,000 people, most of whom had others dependent upon them.    That this immense amount of suffering and death is largely due to mismanagement and recklessness in the

railroad authorities is evidenced by the fact, equally well known, that in Europe, where there must also be some unavoidable accidents and some negligence, the ratio of casualties on the railroads in proportion to the number of passengers and employees is less than one-twentieth of what it is in this country.

Whatever the courts can do to sustain the constitutional protection of life and person to every citizen they should do. We have done so as to automatic couplers and the block system. On such an occasion as this, of a double death at a crossing, it is not amiss to call attention to this evil also. It may be, and doubtless is, cheaper for the railroads to pay for those killed and wounded than to take efficient steps to prevent these lamentable casualties. But considerations of humanity should have some weight. That full nineteen-twentieths of these casualties are avoidable the above figures for European railroads conclusively show. And is there no responsibility upon the authorities of the counties and towns where dangerous crossings are located to apply to the railroad officials to raise or lower their tracks at those points? If a reasonable and just application of this kind is refused, the county or town authorities can and should apply to the Corporation Commission, which is vested with full and complete power to compel the raising or lowering of the track, to remove all danger to those using the public roads. This has been done by the authorities of Wake County as to several crossings at or near Raleigh, where the street or county road now passes under the railroad track. Their example might well be followed elsewhere. In a government avowedly of and for the people some consideration should be paid to the safety of the life and limb of the citizen.